[Filed January 16, 1889.]

## J. T. VINCENT AND H. W. VINCENT, APPELLANTS, v. CHARLES LOGSDON ET AL., RESPONDENTS.

JOINT CONTRACT AS TO THIRD PARTIES — HOW REGARDED IN A COURT OF EQUITY. — Where two parties jointly contract an indebtedness to a third party on account of a matter in which each of the two has an interest, and they treat it in their dealings with such third party and with each other as a joint affair, a court of equity, in a suit between the parties to adjust their respective rights and liabilities on account of the debts, will, if in accordance with justice, regard it as a joint obligation, and will not undertake to determine that the party for whose immediate benefit it was created was a principal debtor, and that the other, who only received a remote benefit from it, was a mere surety for him, although no privity in fact existed between them.

ID. — Where L. was proprietor of a certain saw-mill, which J. T. V. desired to have removed and located upon land owned by her, subject to a life estate in her father and mother, and L. accordingly removed and located the mill, and J. T. V., being interested generally in having the mill operated, she and L., in order to further the enterprise, requested B. and K., from time to time, to furnish on joint account material, machinery, and labor for the mill, without any understanding between each other as to their respective rights and liabilities, thereby creating a debt against themselves, which became a lien upon the mill: held, that the allegation in the complaint to the effect that J. T. V., at the special instance and request of L., became security, and not otherwise, for him, and personally responsible to B. and K. for the material, machinery, and labor furnished by them from the mill, was not sustained by the proof; and that the debt, as between J. T. V. and L., should be regarded as their joint obligation. And J. T. V. having soon after become owner of the mill, and B. and K. having commenced a suit against her and L. and others to foreclose such lien, and enforce payment of said debt; and L., at the instance and request of J. T. V., having deposited a note and mortgage held by him against a third person with B., with directions to the latter to raise money thereon and pay off the debt, which were subsequently, in accordance with an understanding between J. T. V. and L., surrendered up, and another note and mortgage substituted by L. in their stead; and B. having failed to realize any funds from the note and mortgage with which to pay the debt, and J. T. V. having been compelled to pay it: held, in a suit by J. T. V. against L., to enforce an application of the note and mortgage to the payment of the debt to her, that the delivery of the note and mortgage to B., as mentioned, constituted an appropriation of them for the purpose of paying the debt, and created an equitable lien thereon to the extent of Logsdon's liabilities;

and that J. T. V. was entitled to a decree against L. for one half the amount paid by her in satisfaction of the debt, and to have the note and mortgage applied to that purpose.

APPEAL from the Circuit Court for the county of Benton.

*John Kelsay* and *S. T. Jeffreys*, for Appellants.

*W. S. McFadden* and *J. W. Rayburn*, for Respondents.

THAYER, C. J. — This appeal is from a decree rendered in a suit brought by the appellants against the respondent Charles Logsdon, to compel a certain note and mortgage in the hands of J. R. Bryson to be applied in payment of an indebtedness originally owing to Belknap Brothers & Kennedy Brothers, for the machinist labor, machinery, and materials furnished by them in repairing a certain saw-mill known as the Caledonia Mill.

The appellants alleged in their complaint that from the thirty-first day of March, 1885, until the seventh day of March, 1886, the respondent Charles Logsdon was owner of the saw-mill, which was situated upon lots No. 2 and 3 and the southwest one fourth of the southwest one fourth, and the east half of the southwest fourth of section 17, township 11 south, range 11 west, Willamette meridian, county of Benton, state of Oregon; that William Stevens and Anna Stevens, his wife, were the owners of said described land for the term of their natural lives, and upon their death it was to revert to the appellants; that on or about the twenty-seventh day of July, 1886, said appellant J. T. Vincent became the owner of said saw-mill property, and appurtenances thereunto belonging, and was still the owner of the same; that the respondent Charles Logsdon, together with the appellants, between the thirty-first day of March, 1885, and the twenty-second day of August, 1885, became indebted to Belknap Brothers & Kennedy Brothers for the machinist labor, ma-

chinery, and materials furnished on and for said saw-mill
in the sum of $444.50; that the appellant, at the special
instance and request of the respondent Charles Logsdon,
became security, and not otherwise, for the said respond-
ent, and personally responsible as aforesaid to said Bel-
knap Brothers & Kennedy Brothers for said machinist
labor and materials furnished upon and for said saw-mill
for the said sum of $444.50; that said respondent, to in-
demnify and save harmless the appellants, for and in
consideration of their becoming bound for said indebted-
ness, agreed to deliver, and did deliver, on or about the
first day of November, 1885, to said Bryson the said note
and mortgage, which were signed by J. A. Hawkins in
favor of the respondent, to the amount of $918; that, by
mutual consent and agreement between the respondent
and the appellant J. T. Vincent, said note and mortgage
were taken up, and in lieu thereof the note and mortgage
set out in the complaint were substituted; that the said
note and mortgage were delivered to said Bryson with
the intention and purpose that he should borrow a sum
of money sufficient to pay said demand of Belknap Broth-
ers & Kennedy Brothers; that suit was commenced in
said circuit court by said Belknap Brothers & Kennedy
Brothers to enforce payment of said indebtedness against
appellants and the respondent, and a decree obtained in
favor of the former, by which it was decreed that the
latter pay said $444.50, also attorneys' fees, amounting to
$60, together with the costs and disbursements of the
suit; also that the saw-mill and appurtenances belonging
thereto, and three acres of land upon which the mill is
situated and adjacent to it, be sold to pay said debt, fees,
costs, and disbursements; that the appellant J. T. Vin-
cent has paid in full said debt, fees, costs, and disburse-
ments, amounting in the aggregate to the sum of $637;
and that the said respondent was wholly insolvent, and

had no other means to pay said indebtedness except said note and mortgage.

The respondent Charles Logsdon, and Margaret Logsdon, his wife, the latter in the mean time having been made a party defendant in the suit by order of the court, filed an answer to the said complaint, in which they denied all the material allegations contained therein. Said parties then attempted to set up a further defense, but the matter is so awkwardly and unskillfully stated, and contains so many repetitions, that it will puzzle any one to find out what is meant by it. It contains a statement, in substance, that Charles Logsdon assigned to said Bryson the first note and mortgage alleged in the complaint to have been delivered to the latter on or about the first day of November, 1885, in trust for the benefit of the said Margaret Logsdon, the Philomath College, and J. E. Henkle & Co., with the understanding that Bryson should collect it, and after deducting his fees for collection, should pay one hundred dollars of the balance to the college, two hundred dollars to said J. E. Henkle & Co., and the remainder, about six hundred dollars, to the said Margaret, who was alleged to be the owner and holder of the note and mortgage to the extent of that sum. They further alleged, in substance, that, in consideration of the said note and mortgage, said J. T. Vincent agreed to make and execute to Margaret Logsdon a good and sufficient deed of conveyance to said saw-mill, together with sufficient ground for the convenient use of it; and that thereupon, relying upon said agreement, the said Charles Logsdon deposited the said note and mortgage with said Bryson with the express understanding with said J. T. Vincent and said Bryson that a part of said note and mortgage, when collected by said Bryson, should be applied upon said indebtedness to Belknap Brothers & Kennedy Brothers, provided that said J. T. Vincent should

first make and execute such deed of conveyance of the saw-mill, appurtenances, and ground as aforesaid free from all liens and encumbrances; that said J. T. Vincent had wholly failed and neglected to make and execute such deed, although often requested so to do; that said Charles Logsdon, after the said failure, on or about March, 1886, took up and canceled the said note and mortgage first deposited, and that the second note and mortgage was upon the conditions and terms set out therein, and not otherwise.

The appellants filed a reply to the new matter in the answer, denying the material allegations contained therein. It appears from the transcript that the Philomath College and J. E. Henkle & Co. were also made defendants in the suit by order of the said circuit court.

Upon the hearing of the case, on the allegations and proofs taken therein, the said court decreed that the appellants' complaint be dismissed, which is the decree appealed from. The affairs of the parties involved herein are so badly complicated that it is nearly impossible to ascertain their respective rights and liabilities.

The appellants are husband and wife, and the latter, Mrs. J. T. Vincent, seems to have had the principal control of their matters. Logsdon appears to have had extensive business relations with them, and to have been largely in their debt, but what the business consisted of, or how the debt arose, is only hinted at in the evidence submitted. Mrs. Vincent testified that she began trusting him and selling him goods about the middle of July, 1884, and trusted him to goods and paid his bills right along to August, 1885, he assuring her all the time that he had plenty of property to pay her for everything. But what Logsdon's business was is not shown. I infer that he had a saw-mill at a place called Depot Slough, which he moved around to Caledonia, and set up on land

belonging to Mrs. Vincent, subject to a life estate in her father and mother, William Stevens and wife.

Mrs. Vincent was asked, when on the stand as a witness, to explain why it was that she settled Logsdon's bills which she stated that he agreed to pay her afterwards, to which she made the following answer: "We were anxious to have the mill around the place, and after it was there, we wished to see it a-moving or working, or whatever you are a mind to call it; and as Mr. Logsdon did not have the ready means, and we supposed him a good and honorable man, we furnished him with means to carry on his business as long as we could for the want of means ourselves, or myself, whichever you are a mind to; and the 1st of August, 1885, I told him that I could not help him any longer."

This answer and other evidence and circumstances in the case indicate that the Vincents encouraged Logsdon in the prosecution of an enterprise which apparently was beneficial to them and very unprofitable to him. They alleged in their complaint that at his special instance and request, "and not otherwise," they became security for him, and personally responsible to Belknap Brothers & Kennedy Brothers for the labor and material furnished for the mill out of which the debt arose that is the subject of contention between the parties; but their allegation upon that point is wholly disproved by the evidence.

Kennedy, one of the firm of Belknap Brothers & Kennedy Brothers, testified that H. W. Vincent told him that they, meaning Vincent and Mrs. Vincent, owned an interest in the Logsdon mill, and ordered machinery for it from them (referring to said firm). Ordered it shipped to Vincent and Logsdon, Caledonia, Oregon. That said firm, between April 1, 1785, up to and during the month August, 1885, furnished machinery, material, and mechanics' labor for the repair of and use in the mill;

XVII. Or.—19

that H. W. Vincent first applied for and ordered the first bill of machinery; that Mrs. Vincent shortly after countermanded the bill by letter sent by Charles Pearse, who gave a second order, directed in the letter. Afterwards, said H. W. Vincent ordered machinery and repairs, as also did Mrs. Vincent. Some of the repairs which Mrs. Vincent ordered she paid for at the time, and some she sent money afterwards. This machinery was ordered shipped to Vincent & Logsdon, Caledonia. That Mrs. Vincent or H. W. Vincent applied or requested their firm to furnish said machinery and material, or any part of it, on the individual credit of Charles Logsdon, except one job, which was the making of a valve-stem, the last item on the bill, September 11, 1885; that their firm joined Charles Logsdon in the suit to recover pay for this machinery and material, because Vincent and others had informed them that there was a copartnership of H. W. Vincent and J. T. Vincent and Charles Logsdon, under the firm name of Vincent & Logsdon.

The testimony of S. E. Belknap, another member of the said firm of Belknap Brothers & Kennedy Brothers was to the same effect. Both of these witnesses gave proof that H. W. and J. T. Vincent did not become security for Charles Logsdon in the purchase of the machinery and material out of which the said debt arose, but that all three of them were principal contractors, and that the Vincents had far more to do with ordering the articles than Logsdon did.

It also appeared in proof that on the sixth day of April, 1885, the said Charles Logsdon executed to the said William Stevens an instrument in writing, under seal, whereby, in consideration of two thousand dollars, he granted to the said Stevens the said saw-mill, and all the fixtures and appurtenances thereunto belonging, which said instrument was, on the tenth day of April, 1885, duly

recorded in the office of the clerk of the county of Benton; and that the said Stevens claimed ownership thereof from May, 1885.

In view of this evidence, and the fact that the mill was located on land belonging to Mrs. Vincent and the Stevenses, and that Mrs. Vincent became the owner of the mill in less than a year after the material was all furnished, it would appear inequitable to hold that Logsdon was the principal debtor to Belknap Brothers & Kennedy Brothers on account of the said machinery, material, and labor furnished by them, and that the Vincents were mere sureties for the payment of the debt thereby created; or, that as between Logsdon and the Vincents, that the former should be required to pay any part of it.

It appears, however, from the testimony of C. H. Pearse, a witness in the suit, that Mrs. Vincent and Logsdon had a settlement of their affairs on the first day of August, 1885, and that a written memorandum was made at the time showing how their accounts stood. Mrs. Vincent having testified that she had the original writing, but that it was lost, and after diligent search could not be found, the witness undertook to state what it contained. His statement was as follows: The writing contained, first, a full statement of all sums due from Charles Logsdon and all sums due to Charles Logsdon, leaving a balance against him of about four thousand one hundred dollars. He was then credited with two thousand dollars as being secured, and agreed to give note and mortgage on his farm for the remaining two thousand one hundred dollars (or about). He was charged with all moneys expended up to August 1st for his benefit; that is, any moneys expended relating to the improvement of the mill. There remained several unsettled claims, or partially settled, notably the Belknap Brothers & Kennedy Brothers'. In these claims (these unsettled claims, that is), he was charged

with moneys actually expended,—in the Belknap case about seventy-nine dollars. It was understood or agreed that all unsettled claims should be paid by Charles Logsdon; in his failure to pay these claims, J. T. Vincent should pay them, and increase his indebtedness to her by that amount. The agreement was taken first in the form of a memorandum, there being present Mr. and Mrs. Vincent, Mr. and Mrs. Logsdon, and myself. The memorandum was signed afterwards. I made two copies of this memorandum; one was signed by J. T. Vincent and given to Charles Logsdon; the other was signed by Charles Logsdon and given to Mrs. Vincent, together with the original memorandum. The witness thought that there remained unsettled of the Belknap Brothers and Kennedy Brothers' claim, that time, about three hundred dollars. It appears, also, from the testimony of Mrs. Vincent and William Stevens, that the grant of the mill by Logsdon to the latter, on the sixth day of April, 1885, was intended as a mortgage to secure two thousand dollars, the consideration money therein mentioned. Said witnesses testified that Mrs. Vincent used two thousand dollars belonging to Mr. Stevens for Logsdon's benefit, and that Logsdon secured its payment to Stevens in the way mentioned. And it further appeared, from the testimony of F. S. Trevit, a witness in the case, that, in March, 1886, he bought the mill; that he had a talk with Mrs. Vincent about it, and she told him that it belonged to Logsdon; that her father had a bill of sale of it for two thousand dollars, but that he had given Logsdon a writing that he would relinquish it to the latter by his paying the two thousand dollars, on the first day of January, 1887. After that, witness met Logsdon at the mill, and he asked him what he expected to get for it. To which Logsdon answered, that if he sold it, he expected to get four thousand dollars for it. That the next time he saw Mrs. Vincent to talk with her

about it, he told her the conversation that he had had
with Logsdon, and she said that to satisfy Logsdon about
the price of the mill, and to induce him to give up the
obligation, she would give him one thousand dollars
in addition to what witness had offered him, which was
two thousand dollars; that in a conversation witness after-
wards had with Logsdon, he had concluded to take the
three thousand dollars, and that was the way the trade
was made.

It appears, also, that some time in the early part of Oc-
tober, 1885, William Stevens signed a written defeasance,
which recited that Charles Logsdon did, on or about the
first day of May, 1885, make, execute, and deliver over to
him a bill of sale of the steam saw-mill, etc., which, al-
though absolute in form, was intended to secure to him
the payment of the sum of two thousand dollars, with
interest at ten per cent per annum from the date of the
bill of sale, and which contained an agreement on the
part of Stevens to the effect that if Logsdon paid him
said sum and interest on or before the first day of Janu-
ary, 1887, he would execute and deliver to Logsdon's wife,
Margaret, a release in her favor of all claims on the mill;
otherwise all their right therein should be forfeited.

The respondents claim that this defeasance was never
delivered to Logsdon, and that he had nothing to do with
it. They also controverted the other testimony referred
to. I think that the transactions in regard to the settle-
ment and sale of the mill were had as testified to by the
witnesses named; but at the same time I am very much
inclined to the belief that Logsdon was only a passive
party in the affair. It looks to me as though he has had
very little volition in the business transactions between
himself and Mrs. Vincent; that the straight of the matter
is, that she has really represented both parties in their
contracts, trades, and settlements with each other. She

proved by the witness Pearse that when she settled with Logsdon she signed a writing containing an agreement that all unsettled claims, including the claims of Belknap Brothers & Kennedy Brothers, should be paid by him; that "in his failure to pay these claims, she should pay them and increase his indebtedness to her by that amount." And yet when said firm brought suit to foreclose a mechanic's lien against the saw-mill for said claim, making her, H. W. Vincent, and Logsdon parties to the proceeding, instead of paying it herself, as per agreement, she had Logsdon at Bryson's making an arrangement with the latter to get the case put over until the next term, and to devise means to pay off the claims.

Mr. Bryson testified, as a witness in the case, in answer to the question, "Please state for what purpose this note and mortgage were given you," as follows: "I will give you the circumstances, and state what was said at that time, as near as I now remember it. Mrs. J. T. Vincent, H. W. Vincent, and Charles Logsdon had been sued in this court by Belknap Brothers & Kennedy Brothers for about four hundred dollars upon a mechanic's lien against the Caledonia saw-mill property. They employed me to represent them in the case, and to put it over, if possible, until the spring term of court, for which they were to pay me fifty dollars. Mrs. Vincent and Mr. Logsdon came to my office together and talked over the case, and were trying to devise means to raise the money to pay off this claim. During the conversation, it was stated by one or both of them that Mr. Logsdon had this note and mortgage against Hawkins which I have mentioned, and they asked me if the money could be raised on the note, or the note be collected. Mr. Logsdon told me that it was a first mortgage; at least, he did not say anything about there being another lien upon the property at the time, as I now remember it. I told them that I thought I could

either collect that note or get money on it. The note was in Judge Holgate's possession. Mr. Logsdon left my office, got the note and mortgage, and brought them to me to collect the note and pay my fees in the Belknap-Kennedy case for collection out of it, and pay off the claim of Belknap Brothers & Kennedy Brothers out of the remainder.

The witness, upon being asked what became of that note, if anything, answered: "I found upon examining the records that there were other liens against the property prior to this one,—one in favor of Leabo for about five hundred dollars, and one in favor of America Hawkins for about one thousand dollars. I was unable to then collect the note or raise money on it, as the mortgaged property was only worth about two thousand five hundred or three thousand dollars, and after consulting with both Mrs. Vincent and Mr. Logsdon, it was agreed that I should take a new note and mortgage for the amount due. By so doing, this became a second mortgage, Leabo's mortgage being first, and America Hawkins, who is the mother of J. A. Hawkins, taking a third mortgage for her amount for about one thousand dollars. This agreement was consummated March 11, 1886. Mr. Logsdon came in from the bay the preceding day. He told me he had nothing more to do with the Caledonia mill property nor the Belknap-Kennedy claims, and wanted me to take the note and mortgage in the name of his wife, Margaret Logsdon. I had not heard from Mrs. Vincent in reference to the matter, and declined to do this, but agreed that it should be taken in his name, and the note and mortgage transferred to me, and then I would hold the same in trust, to be paid to Margaret Logsdon, after first paying my own fees; and there was also one hundred dollars and interest to be paid to Philomath College, two hundred dollars and interest to be paid to J. E. Henkle, when the same was collected in full, these amounts

being offsets against Logsdon on the original note in favor of J. A. Hawkins; provided that Mrs. J. T. Vincent waived all claims on the note, or provided that she failed to establish such claims; that is, the surplus, after paying my own claim, Philomath College claim, J. E. Henkle's claim, to be held by me in trust for Margaret Logsdon, providing Mrs. J. T. Vincent was not entitled to the same or some part thereof."

Mrs. Vincent does not seem to have claimed in this conference that the debt belonged to Logsdon to pay. She appears to have been more exercised about devising ways and means by which to secure its payment. She did not demand as a right that Logsdon should make use of the note and mortgage against Hawkins by which to raise funds in order to pay off the debt, though she was doubtless willing that that course should be pursued to accomplish the result.

Logsdon claims that he deposited the note with Mr. Bryson, and authorized him to raise money on it with which to pay the debt, upon the condition that Mrs. Vincent should deed to his wife the saw-mill, with sufficient ground upon which it stood and adjacent thereto for the convenient use of it. But no such arrangement evidently was made in the presence of Mr. Bryson, nor was he informed of it. If he had been, he would doubtless, being a lawyer, have had the arrangement put in writing, or, at least, have suggested to the parties the necessity of doing so. It is hardly possible, it seems to me, that any such arrangement was made at the time, or that the parties took into consideration their respective rights and liabilities as between themselves. They had all, probably, been served with a summons in the suit, and were mainly intent upon contriving means by which the matter could be adjusted. In all their business transactions they seem to have been wholly indifferent regarding their obliga-

tions to each other, and to have managed their affairs as though their interest in them was in common. Logsdon denies that he had anything to do with the creation of the debt. He insists that he sold the mill to Stevens on the sixth day of April, 1885, and has had no interest in it since that time; but the evidence shows to the contrary, —shows that he had possession of the mill, and used it up to the time it was sold to Trevitt.

Mrs. Vincent confesses that she had an interest in having the mill located at Caledonia, and wished to see it moving after it was brought there; and that she had a pecuniary interest in it is quite apparent.

The settlement between the parties, pretended to have been made on the first day of August, 1885, according to the appellants' own showing, was left at loose ends. That they settled up everything except the outstanding unsettled claims against them, which they allowed to remain and increase, is very remarkable; more especially so in view of the testimony of Mrs. Vincent that on that date she told Logsdon that she could not help him any longer.

Where parties have dealt with each other in a particular manner, I do not see any better way in adjusting their affairs, as between themselves, than to recognize and carry out the mode which they themselves have adopted and pursued. In this case the parties contracted the debt in question jointly. In doing so, they evidently consulted their respective interests, and each was benefited thereby. I think, therefore, that the debt should be regarded as a joint obligation, not only as between them and their creditor, but as between themselves. Under this view, Charles Logsdon should be held liable for one half of the $444.50, and the appellants for the other one half thereof. The appellants have paid, in addition to the debt, the costs of the foreclosure of the lien. This might have been avoided by paying the debt before suit, and it

seems to have been the understanding that Mrs. Vincent
should pay all unsettled claims in case Logsdon failed to
pay them, and thereby increase his indebtedness to her;
but Logsdon was equally liable with her for their pay-
ment, and equally responsible for the neglect to pay them.

The amount of the costs of the foreclosure does not
appear.   The appellants alleged in their complaint that
the full amount paid by them on account of the debt and
costs aggregated $637; that is, however, denied in the
answer, and the only evidence in the suit regarding the
matter which I have been able to discover is in the tes-
timony of Mrs. Vincent.   She testified that she had paid
in the settlement of the claim in full something over six
hundred dollars; that she did not remember the exact
amount.   Under this proof, we would only be justified in
finding that she paid six hundred dollars in settlement of
the claim in full.

The respondents' counsel claims that the appellants
must fail in their suit for the reason that they failed to
show any consideration or agreement whatever for the
deposit of the first note and mortgage, either as security
for Charles Logsdon, or otherwise; that there was any
agreement between Mrs. Vincent and Logsdon for taking
up the first note and mortgage, and taking the note and
mortgage of March 11, 1886, in lieu thereof; or that
appellants, or either of them, became bound or indebted
to Belknap Brothers & Kennedy Brothers in the sum of
$444.50, or any other sum, for Charles Logsdon.

We disagree with the counsel as to the facts assumed
by him in the first two propositions.   We think the tes-
timony of Mr. Bryson shows to the contrary.   Upon the
third proposition he may be said to be technically correct
as to the facts; but if the debt were a joint obligation on
the part of the appellants and Logsdon, as we conclude it
was, the delivery of the note and mortgage to Mr. Bryson

to enable him thereby to raise funds with which to pay the debt would constitute, in equity, a pledge of them for that purpose; it was an appropriation of them for its payment, and created an equitable lien thereon to the extent of Logsdon's liability upon the debt. In our opinion, the appellants are entitled to a decree against the said Charles Logsdon for the sum of three hundred dollars, to be paid out of the said note and mortgage in the hands of J. R. Bryson, after first paying to the latter the sum of fifty dollars, and any additional fees or expenses he may be entitled to or incur; and that the balance and residue of said note and mortgage be paid to Margaret Logsdon, subject to the condition as stated herein; that neither party is entitled to costs, but that each of them be required to pay one half of the fees of the clerk of this court incurred herein; that the said Bryson be appointed a receiver to collect the said note and mortgage or otherwise dispose of the same, and from the proceeds thereof retain and pay out the several sums specified, also the fees of the said clerk, reserving one half thereof from the appellants' three hundred dollars, and that he.pay the residue to the respondent's counsel herein.